BEATIE AND OSBORN LLP
Daniel A. Osborn (CSB No. 132472)
521 Fifth Avenue, 34th Floor
New York, New York 10175
(212) 888-9000

LAW OFFICES OF ELIC ANBAR
Elic Anbar (CSB No. 122979)
11770 Bernardo Plaza Court, Suite 453
San Diego, California 92128
Telephone:   (858) 521-1160
Facsimile:   (858) 521-0884

Attorneys for Plaintiff and All
Others Similarly Situated

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

------------------------------------------------------------- X
FERNANDO RUIZ, individually and on behalf of all
others similarly situated,

                    Plaintiff,

        v.

AFFINITYLOGISTICS CORPORATION,

                    Defendant.
------------------------------------------------------------- X

Civil No.

**CLASS ACTION COMPLAINT**

Plaintiff Fernando Ruiz, by and through his attorneys, Beatie and Osborn LLP and Law Offices of Elic Anbar, as and for his Complaint against Affinity Logistics Corporation, alleges as follows:

**NATURE OF THE ACTION**

1. Plaintiff brings this action as a collective action on behalf of a class of all current and former delivery drivers of Affinity Logistics Corporation ("Affinity"). Plaintiff alleges that Affinity has failed to pay overtime wages to the drivers in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 <u>et</u>. <u>seq</u>.

2. Plaintiff also brings this action as a class action on behalf of all current and former delivery drivers of Affinity who were employed within the State of California. Plaintiff alleges that Affinity has failed to pay these drivers: (i) employee benefits as required by California state law and (ii) overtime and other wages in violation of California state law.

3. Plaintiff's claims stem from defendant's improper classification of its delivery drivers as independent contractors rather than employees.

4. This case involves two classes: All current and former delivery drivers employed by Affinity at any time between May 18, 2003 and the date of the resolution of this Complaint (the "Class").

5. The second class is defined as follows: All current and former delivery drivers employed by Affinity within the State of California at any time between May 18, 2001, and the date of the resolution of this Complaint (the "Subclass").

## THE PARTIES

6. Plaintiff Fernando Ruiz is a resident of the State of California. From November 2003 until approximately October 2004, plaintiff was employed as a delivery driver by Affinity.

7. Defendant Affinity is a Georgia corporation; maintains its principle place of business at 533 Johnson Ferry Road, Building D, Suite 400, Marietta, Georgia 30068; and provides residential delivery services and logistics support to home furnishing retailers across the country.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the claims asserted in the action pursuant to 28 U.S.C. §§ 1331, 29 U.S.C. § 216(b), and 29 U.S.C.§ 1132(e)(1).

9. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of defendant's activity, including the failure to pay overtime and benefits, occurred in this district and because Affinity resides within this district.

## FACTS

10. Beginning on approximately May 4, 2001, plaintiff Ruiz worked as a truck driver for Penske Corporation. Mr. Ruiz's principle responsibility was to deliver appliances exclusively for Sears, and he did so until Penske went out of business on approximately November 8, 2004.

11. After Penske ceased doing business, Affinity approached Ruiz and, upon information and belief, all of the other former Penske drivers, and asked them if they wanted to drive for Affinity. As Affinity drivers, Ruiz and the others would perform the same work that they performed while employed by Penske.

2

12. At Penske, Ruiz was classified as an employee; at Affinity, Ruiz was classified as an independent contractor.

13. Prior to commencing work for Affinity, the company required all delivery drivers to fill out a form stating that they were legal residents of the United States and that they could be legally employed in the United States.

14. Affinity also gave the delivery drivers a complete physical (including a drug test) and ran a complete background investigation (including a credit check).

15. After a prospective driver proved that he was a legal resident and passed the physical examination and background check, Affinity required the applicant to sign an Independent Truckman's Agreement (the "Agreement"). The Agreement stated that the delivery driver would drive exclusively for Affinity and described how he would be compensated.

16. Although the Agreement stated that it would be in effect for just one year, it simultaneously stated that it would remain in effect from year-to-year until the parties agreed to terminate it.

17. Each party had the right to terminate the Agreement upon mutual consent at any time. If Affinity terminated the Agreement without cause, it had the right, at its option, to transfer the driver to another location.

18. With respect to equipment, Affinity provided plaintiff with a truck with a "Ryder" logo on it. Neither Ruiz nor any other drivers were required to review or sign any agreement regarding the Ryder truck. Upon information and belief, Affinity leased its trucks from Ryder.

19. Affinity did, however, require each and every driver to execute an Equipment Lease Agreement (the "Lease"). Under the Lease, the delivery driver agreed to provide Affinity with a delivery vehicle.

20. Pursuant to the Lease, the delivery driver would lease to Affinity the Ryder truck that Affinity had secured for the delivery driver.

21. At the end of each day, Ruiz was required to leave the delivery truck in Affinity's possession or control. Ruiz could not take the delivery truck home, use it for personal reasons or store the truck at another location.

22. Affinity was responsible for ensuring that the delivery trucks were serviced and maintained. Ruiz and the other drivers were not charged for service repairs on their trucks

23. In addition to providing the Ryder delivery truck, Affinity also provided Ruiz and the Class with all the tools and equipment that they needed, including protective moving pads, to deliver the merchandise.

24. Affinity required Ruiz and every other Class member to prepare and file a fictitious business name statement.

25. Affinity prohibited Ruiz and every other member of the Class from putting their fictitious business name on the Ryder truck.

26. Affinity also prohibited its drivers from wearing a uniform with their business name on it. Instead, Affinity required each delivery driver to hold himself out to the customer as if he worked for the company for which he was making deliveries. For example, plaintiff Ruiz delivered for Sears. Affinity gave plaintiff a uniform with the name "Sears" embossed on it and required plaintiff to identify himself as a Sears employee.

27. Plaintiff also was not allowed to identify himself by his independent corporation when contacting a customer. If a driver or deliveryman failed to wear his uniform or identified himself as working for anyone other than Sears, Affinity would dock the driver's pay.

28. Affinity required its drivers to report to work at 6:00 a.m., six days per week.

29. Affinity also controlled when and how its drivers worked. For example, if a driver wanted to take a day off, the driver had to ask permission from Affinity. In November 2004, plaintiff Ruiz asked for two days off. Affinity's Manager denied the request and allowed plaintiff only one day off, on the date the Manager chose. The Manager threatened to terminate plaintiff's contract if he did not agree to take off the assigned day, and only the assigned day.

30. Plaintiff and the Class were paid weekly by Affinity. Affinity compensated its drivers based on the amount of deliveries they made.

31. Affinity provided a financial incentive for its driver's to make their deliveries in the shortest amount of time. Conversely, if a driver took too long to make his deliveries, Affinity would

dock the driver's pay.  At the end of each day, Affinity required its drivers to furnish Affinity with a time sheet and manifest log.

32. Affinity also controlled how profitable its drivers would be by assigning delivery routes based on each driver's past performance.  If a driver had a history of making a large number of deliveries in a short amount of time, that driver would be assigned the more profitable routes.  Drivers that performed poorly were assigned the less profitable routes.

33. Upon arriving at work, plaintiff Ruiz and the other members of the Class were handed a written manifest by an Affinity manager.  The manifest would identify the customer name, address and product(s) to be delivered.  The manifest also would establish the order of the deliveries.  Plaintiff and the Class were not to deviate from the established schedule.  If a driver deviated from the route set by Affinity, the company would dock the driver's pay.

34. At the warehouse where plaintiff Ruiz reported to work each morning, Affinity assigned a mailbox to each driver.  Affinity used the mailboxes to provide messages to its drivers.

35. Affinity required that each truck be manned with one driver and one assistant.  Affinity directed its drivers to pay their assistants a flat fee of $100 per day.

36. Affinity controlled the hiring of assistants.  Affinity screened and performed a background check on all applicants (and subsequently deducted the cost of this background check from the paychecks of its drivers).  If Affinity did not like the way an assistant looked or performed, Affinity would direct the driver to fire the assistant.

37. Inconsistent with the notion of independent contractor status, Affinity also required that its delivery drivers perform the deliveries themselves; that is, the drivers could not subcontract their deliveries to third parties.

38. Affinity also had the ability to require its delivery drivers to undertake responsibilities other than delivering appliances.  For example, Affinity could and did require plaintiff Ruiz and the other members of the Class to train new drivers.

39. As a condition of employment, Affinity demanded that its drivers carry workers compensation insurance for themselves and their assistants.  Affinity set up the worker's compensation program, then deducted the premiums from the drivers' paychecks.

5

40. Affinity deducted other expenses from its drivers' paychecks. These expenses included the lease payment for the delivery truck, individual insurance, cellular telephone calls made from an Affinity provided cellular telephone, performance bond costs, uniform costs and vehicle insurance.

41. Affinity did not withhold income taxes or any other taxes. Each year, Affinity provided plaintiff Ruiz and the other members of the Class with a Form-1099.

42. From time to time, Affinity would ask a driver to be "on standby." If the driver refused, he would be docked $150. If the driver accepted standby, was called, but did not respond, he would be docked $250.

43. Plaintiff and the other members of the Class were not allowed to work for any other company while they were under contract with Affinity.

44. Affinity had the right and controlled the means by which its drivers performed their work. Based on Affinity's authority and control over its delivery drivers, plaintiff and the Class of delivery drivers were improperly classified as independent contractors rather than employees.

**CLASS ACTION AND COLLECTIVE ACTION ALLEGATIONS**

45. Plaintiff brings this action as a collective action under 29 U.S.C. Section 216(b) and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

46. Plaintiff brings this action on behalf of himself and on behalf of all others similarly situated.

   1. The Class is defined as "All current and former delivery drivers employed by Affinity at any time between May 18, 2003, and the date of the resolution of this Complaint."

   2. The Subclass is defined as: "All current and former delivery drivers employed by Affinity who were employed within the State of California at any time between May 18, 2001, and the date of the resolution of this Complaint."

47. Upon information and belief, Affinity employs hundreds of delivery drivers throughout the United States. With hundreds of delivery drivers geographically dispersed, joinder of all Class members is impracticable.

48. Upon information and belief, Affinity employs approximately one-hundred delivery drivers in California. With approximately one-hundred delivery drivers geographically dispersed throughout California, joinder of all Subclass members is impracticable.

49. All Affinity drivers share a common legal grievance against Affinity. As described in this Complaint, all drivers have suffered damages arising out of Affinity's improper classification of them as independent contractors.

50. Questions of law and fact are common to all Affinity drivers, making them all similarly situated. Among the common questions of law and fact are the following:

1. Whether Affinity's drivers are employees;
2. Whether Affinity unlawfully failed to pay overtime wages and other state law compensation to its drivers in violation of the FLSA;
3. Whether Affinity willfully violated the FLSA;
4. Whether Affinity failed to pay its drivers common law benefits; and
5. The proper measure of damages sustained by plaintiff and all other similarly situated delivery drivers.

51. The names and addresses and other contact information of the individual Class and Subclass members can be found in the records maintained by Affinity.

52. A class action is superior to other methods for the fair and efficient adjudication of the claims asserted here, and no unusual difficulties are likely to be encountered in the management of this class action. The likelihood of individual Class or Subclass members prosecuting separate claims is remote.

53. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

54. The claims of the plaintiff are typical of the claims of other members of the Class and Subclass, and plaintiff has the same interests as the other members of the Class and Subclass. A class action is superior to any other type of adjudication of this controversy.

**FIRST CAUSE OF ACTION**
**(Violation of the FLSA, 29 U.S.C. § 201 et. seq., on behalf of the Class)**

55. Plaintiff incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

56. Plaintiff and all other members of the Class are employees of Affinity. As employees of Affinity, the FLSA required and continues to require that Affinity pay plaintiff and the Class overtime at the rate of one and one-half times their hourly rate of pay for all hours worked in excess of forty (40) hours per week.

57. Plaintiff and all other members of the Class worked in excess of forty (40) hours per week without receiving the appropriate amount of overtime pay.

58. Plaintiff and all other members of the Class were frequently required to restrict their personal activities and be specifically available to respond to the needs of Affinity while "on standby." They were entitled to be paid for these activities and failed to receive the appropriate amount of pay.

59. Plaintiffs and all other members of the Class have been damaged by Affinity's failure to pay them their required wages and they request compensatory damages in an amount to be determined by a jury.

**SECOND CAUSE OF ACTION**
**(Violation of State Wage Laws on behalf of the Subclass)**

60. Plaintiff incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

61. Plaintiff and the Subclass are or were employees of Affinity who were required by California law to be paid one and one-half times their hourly rate of pay for all hours worked in excess of forty hours in one week, eight hours in one day, or on seven consecutive days. Affinity was required to pay plaintiff and the Subclass double-time for all hours worked in excess of twelve hours in one day or eight hours on the seventh consecutive day.

8

62. Plaintiff and the Subclass worked in excess of forty hours in one week, eight hours in one day, and on seven consecutive days without receiving the appropriate amount of overtime pay. Additionally, some delivery drivers worked in excess of twelve hours in one day or eight hours on the seventh consecutive day without receiving the appropriate amount of overtime pay.

63. Plaintiff and the Subclass were frequently required to work "off the clock." Plaintiffs and the class were entitled to a 10-minute paid break for every four hours they worked. For every 10-minute break that plaintiff and the Subclass were forced to forego, they were entitled to, at least, one hour of pay at their regular rate.

64. Plaintiff and the Subclass were frequently forced to work through their 10-minute breaks without receiving the appropriate amount of pay.

65. For every five-hour shift plaintiff and the Subclass worked, they were entitled to a one-half hour meal break in which they were not required to do any work. If plaintiff and the Subclass were asked to do work during their one-half hour meal break, they were entitled to, at least, one hour of pay at their regular rate.

66. Plaintiff and the Subclass were frequently forced to work during their one-half hour meal break without receiving the appropriate amount of pay.

67. Plaintiff and the Subclass have been damaged by defendant's failure to pay them their required wages and they request compensatory damages in an amount to be determined by a jury.

### THIRD CAUSE OF ACTION
### (Failure to Pay Wages on behalf of the Subclass)

68. Plaintiff incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

69. Plaintiff and the Subclass are or were employees of Affinity. As such, they were entitled to vacation pay, holiday pay, sick pay, jury duty pay, bonuses, severance pay and any other compensation provided to Affinity's employees.

70. Affinity failed to pay plaintiff and the Subclass their wages, including vacation pay, holiday pay, sick pay, jury duty pay, bonuses, severance pay and any other compensation provided to Affinity's employees.

71. As a result of Affinity's conduct, plaintiff and the Subclass have been damaged in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Violations of the Labor Code on behalf of the Subclass)**

72. Plaintiff incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

73. As employees of Affinity, Affinity was not permitted to charge plaintiff and the Subclass for worker's compensation insurance coverage and certain other deductions.

74. Affinity charged plaintiff and the Subclass for their worker's compensation insurance coverage and certain other deductions.

75. Affinity made unlawful deductions from the paychecks of plaintiff and the Subclass in violation of the Labor Code.

76. As a result of Affinity's conduct, plaintiff and the Subclass have been damaged in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**(Unfair Business Practices on behalf of the Subclass)**

77. Plaintiff incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

78. "Unfair" means an act that offends public policy, and/or is immoral, unethical, oppressive, or unscrupulous and which causes substantial injuries to others even if it does not violate a specific law.

79. Affinity's actions were unfair in that it wrongfully classified the Subclass as exempt from the provisions of California's overtime compensation laws, unjustly refused to pay plaintiff and the Subclass for all hours worked and for all wages owed, and made unlawful deductions from the paychecks of plaintiff and the Subclass.

80. Affinity's unfair conduct described above constituted a business practice.

81. Plaintiffs and the other Class Members are entitled to restitution, disgorgement of profits and other equitable relief as a result of Affinity's unfair business practices.

**SIXTH CAUSE OF ACTION**
**(Violations of ERISA on behalf of the Class)**

82. Plaintiff hereby gives notice that he will seek leave to amend the Complaint following exhaustion of any necessary administrative remedies to assert claims, on behalf of himself and the Class, for Affinity's wrongful exclusion of the Class from its 401(k) and other benefit plans subject to ERISA.

83. Plaintiffs are making a claim under the Affinity's benefit plan(s), and will later move the Court for leave to amend the Complaint to assert any claims which theoretically, although erroneously, may be purported by Affinity to require exhaustion of administrative remedies.

WHEREFORE, plaintiff Fernando Ruiz demands judgment against defendant Affinity as follows:

A.  for an Order certifying this case a class action and appointing plaintiff as class representative;

B.  for judgment against defendant Affinity in an amount to be determined at trial;

C.  for an order of injunction preventing defendant from continuing to treat its delivery drivers as independent contractors and violating the state and federal laws as described above;

D   for an award of costs and expenses of this litigation including reasonable attorneys', accountants' and experts' fees and other costs and disbursements; and

E.  granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
May 12, 2005

BEATIE AND OSBORN LLP

_____/S/_____
Daniel A. Osborn
521 Fifth Avenue, 34th Floor
New York, New York 10175
Telephone:   (212) 888-9000
Facsimile:   (212) 888-9664

LAW OFFICES OF ELIC ANBAR
Elic Anbar (CSB No. 122979)
11770 Bernardo Plaza Court, Suite 453
San Diego, California 92128
Telephone:   (858) 521-1160
Facsimile:    (858) 521-0884

Attorneys for Plaintiff